UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-10017-CR-MARTINEZ/SNOW

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

LAWRENCE W. BLESSINGER and
JANET MEADOWS,

    Defendants.

_____

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on the Defendant, Lawrence W. Blessinger's Motion to Suppress Evidence (ECF No. 75), which was referred to United States Magistrate Judge, Lurana S. Snow, for Report and Recommendation. The Defendant is charged with conspiracy to encourage aliens to enter the United States unlawfully and three counts of alien smuggling. He seeks to suppress evidence obtained as the result of a traffic stop of his truck by an officer of the Monroe County Sheriff's Office (MCSO) on December 5, 2014. The motion is fully briefed and an evidentiary hearing was conducted on November 21, 2016.

### I. EVIDENCE PRESENTED

MCSO Sergeant Joel Slough testified that he has been a road patrol supervisor for six years. Prior to that, Sergeant Slough spent ten years on road patrol. He stated that he spends the majority of each day patrolling Marathon, Florida while in uniform and alone in his car. He drives down Coco Plum Drive (Coco Plum) several times per day, and must drive down this street to get from his home to US Highway 1 (US 1).

The Sergeant identified Government's Exhibits 1A and 1B as Google Earth images depicting the area of Coco Plum Drive, Pescayo Avenue and US 1 (Exhibit 1A) and Pescayo Avenue

(Exhibit 1B).  He explained that he passes by Pescayo Avenue (Pescayo) while driving down Coco Plum multiple times per day.  He stated that he does not drive down Pescayo because it is a dead-end street, but as a normal part of his job, he always looks down it for anything out of the ordinary.  Sergeant Slough noted that traffic on Pescayo is very minimal: he sees only vehicles belonging to electrical workers and people renting one or more of the three rental homes located on the left side of Pescayo.  He stated that the renters' vehicles generally are parked in the driveways of the houses or on the hardtop which is adjacent to an island located in front of the driveways.  He usually observes the electrical workers at lunchtime in a shaded area near the intersection of Pescayo and Coco Plum.  Prior to December 5, 2014, during the 14 years he has lived in the area, the Sergeant had only observed one vehicle parked at the end of Pescayo prior to December 5, 2014.

Sergeant Slough related that the issue of illegal dumping is important to the current Sheriff, who is concerned about the environment.  He explained that the Keys comprise a national sanctuary, and dumped items find their way into the ecosystem.  The Sergeant looks for illegal dumping every day, and has discovered dumped items such as yard waste, fish guts and scrap items in the vicinity of Coco Plum and Pescayo.  He explained that in most instances he is unable to identify the people responsible for the dumping because it usually takes place in isolated places with no witnesses, and the dumped items lack indicia of ownership.

Sergeant Slough testified that shortly before December 5, 2014, he received a report of illegal dumping on Avenue K in the Coco Plum area, approximately one mile from Pescayo.  A property owner had complained about multiple loads of yard waste in the area and requested extra patrols by the MCSO.  The extra patrols were initiated, and Sergeant Slough conducted proactive patrols of the area.

The Sergeant stated that as he was headed to his office on December 5, 2014,

he looked down Pescayo at its intersection with Coco Plum. He noticed a black truck stopped at the end of the street, backed into the bush line where the hardtop ends. The truck would have had to make a U-turn or a three point turn to get into this position. The observation was significant to the Sergeant because the truck was capable of carrying yard debris or other large items. Sergeant Slough believed that the truck was in the process of dumping something illegal based on several factors: the isolated location, which had been used for dumping in the past; the way the vehicle was parked; the lack of traffic in the area, and the recent report of illegal dumping in the same general vicinity.

Sergeant Slough turned his car around in order to make contact with the truck. As he turned into Pescayo, he observed the truck driving away from the location where it had been parked, toward US 1. He explained that he has received training, and has experience in the observation of vehicles and was certain that the truck was stationary when he first saw it. As the truck passed Sergeant Slough, its driver (subsequently identified as Defendant, Lawrence Blessinger) waved at him. Based on his experience, the Sergeant believed that the driver either was trying to control his nervousness or put the Sergeant at ease.

Sergeant Slough continued down Pescayo. When he reached a point 100 - 150 feet from the dead end, he observed a large pile of green vegetation in the spot where the truck had been parked. This pile was surrounded by vegetation which had become brown (dehydrated). Based on the color of the pile and its lack of dehydration, the Sergeant believed it to be a fresh dumping of recently cut yard waste. At that point, Sergeant Slough turned his car around and drove down Pescayo at a speed of about 55 mph. He did not see the truck which had just driven away from Pescayo, indicating to the Sergeant that the truck was attempting to distance itself from the pile of vegetation.

Sergeant Slough increased his speed once he reached Coco Plum, activating his siren and lights to warn other drivers of his speed. Eventually he saw the truck approaching the light on

US 1. Based on the truck's distance from Pescayo, Sergeant Slough believed that the truck had traveled above the posted speed limit. When the Sergeant first observed the truck, it was in the right lane, indicating a right turn north on US 1. The truck then switched to the left lane and turned south when the light changed. Sergeant Slough followed the truck and stopped it shortly after it entered US 1. He recognized it as the same truck because of a distinctive stripe and a Harley logo.

Sergeant Slough identified Government's Exhibits 2A-2F, a serious of photographs either taken by the Sergeant or taken in his presence. He stated that Exhibits 2A, 2B and 2C depicted the green pile he had observed at the end of Pescayo. Exhibits 2D, 2E and 2F portray the older vegetation. Exhibits 3A and 3B are photographs of the truck after it had been stopped. Exhibit 3A shows that there was fresh green vegetation on the bumper and step-up area of truck, while Exhibit 3B shows similar vegetation in the truck bed. This confirmed the Sergeant's suspicion that the truck had been engaged in illegal dumping when the Sergeant first observed it. He explained that if the vegetation on the bumper had not been deposited there recently, it would have blown away. Later the Sergeant returned to Pescayo, where he ascertained that the vegetation found on the truck was the same or similar to the green vegetation at the end of Pescayo.

At the time of the stop, Sergeant Slough noticed for the first time that there was a female passenger (subsequently identified as Maria Ortega). He asked the Defendant to produce his license, registration and proof of insurance, and attempted to identify the passenger, but was unable to do so because she spoke only Spanish and she was not carrying any identification. The Sergeant contacted the Border Patrol to request a nearby agent to serve as a translator. He explained that this is common practice for the MCSO, adding that he was not working that day with Border Patrol or any other federal agency. Sergeant Slough did not expect Border Patrol to arrest anyone connected with the dumping.

Months later, Sergeant Slough contacted Homeland Security Investigations (HSI) after he had a discussion with a friend who works for Customs and Border Protection (CBP). The

friend told Sergeant Slough that in the past, the Defendant's boat had been stopped on the water while heading into US waters, and that trinkets from Cuba were found on board. At that time, visits to Cuba were not permitted without a license from the U.S. Treasury. Based on this information, Sergeant suspected that the Defendant might be involved in human trafficking, and relayed the information to HSI.[1] Thereafter, HSI agents interviewed Maria Ortega in connection with an investigation which resulted in the instant Indictment. No one from MCSO participated in the interview or the investigation.

The Defendant was arrested on the instant Indictment in December 2015. Sergeant Slough participated in the event because, on the morning of the arrest, he was asked to keep an eye on the Defendant's vessel, which was kept at his residence. The Sergeant explained that MCSO officers sometimes participate in federal arrests if the federal agency is short handed, or if it is desirable to utilize a marked police car. On the day of the Defendant's arrest, the federal agents who were to make the arrest were waiting for the Defendant at the airport. However, while Sergeant Slough was en route to the Defendant's residence to watch the boat, he saw the Defendant exit a gym and enter his vehicle, which was parked outside the gym. Sergeant Slough effected the arrest of the Defendant and placed the him in the marked police vehicle, to wait for the arrival of HSI.

On cross examination, Sergeant Slough acknowledged that on December 4, 2014, there had been a report of green trimmings located at the end of Pescayo, but stated that he was unaware of that report when he spotted the vegetation the following day. Based on the time indication on his car's dashboard camera video, the Sergeant conceded that the Defendant may have been traveling at the posted speed limit while he drove from the end of Pescayo to the traffic light at US 1. Also based on the video, it appeared that the Defendant had to move into the right turn lane at the light to avoid a collision with a truck that was making a wide turn onto Coco Plum Drive.

---

[1] Subsequently, Sergeant Slough learned that Ms. Ortega is from Paraguay, not Cuba.

After the truck passed, the Defendant moved into the left turn lane. Sergeant Slough stated that he had not noticed the truck on the day of the stop.

Sergeant Slough also admitted that in Monroe County, a property owner may dispose of properly packaged tree trimmings by leaving them curbside and calling the County to pick them up. He stated that the property at the end of Pescayo was privately owned, and that the vegetation he observed on the property was consistent with the plants growing on the property. He also acknowledged that there was a sign on Pescayo offering lots for sale, but there were no "No Trespassing" signs. The Sergeant stated that he returned to the dumping site on December 8, 2014, at which time the offending vegetation still was green.

Regarding his conversation with Ms. Ortega, Sergeant Slough conceded that he warned her that if she did not provide her name, he would call Border Patrol. He also admitted that the MCSO has translators who are available to road patrol officers. The Sergeant testified that he called Border Patrol for a translator, and he excused the MCSO translator who arrived later. Although Sergeant Slough learned at some point that Ms. Ortega did not have papers, the case had not become an immigration investigation at the time the Border Patrol agent (Agent Marin) was translating.[2] Agent Marin's conversation with Ms. Ortega took place outside Sergeant Slough's presence, and the Sergeant was not the officer who took her to the dumping site.

On redirect examination, Sergeant Slough stated that if he had known about the December 4, 2014 report of illegal dumping at the end of Pescayo on the date of the stop, he would have been more suspicious of the Defendant. He also stated that the pile of vegetation he observed was not properly packaged for pickup by the County.

---

[2] At the direction of the Court, counsel for the Defendant filed with the Court a translation of Agent Marin's recorded questioning of Ms. Ortega. (ECF No. 115) The translation demonstrates that Agent Marin's questions were limited to ascertaining Ms. Ortega's name, and that Agent Marin stopped Ms. Ortega when she began to volunteer information about her immigration status.

HSI Special Agent Todd Wilfred Blyth, the case agent on the instant case, testified that Sergeant Slough contacted him about the Defendant in late May 2015. Agent Blyth did not interview Ms. Ortega until June 1, 2015. He stated that he had arranged for some Customs officers to watch the Defendant's vessel on the date of the arrest, but when the time came, he was unable to locate them and asked Sergeant Slough to do it instead. The agent explained that he contacted Sergeant Slough because he was familiar with the Sergeant's schedule and knew that he was on duty.

## II. RECOMMENDATIONS OF LAW

The Defendant relies on the decision of Monroe County Court Judge Ruth Becker, who ruled in the state trial for illegal dumping that Sergeant Slough's stop of the Defendant was unlawful, and suppressed evidence seized as the result of that stop. The State of Florida did not appeal this ruling and dismissed the dumping case. The Defendant asserts: (1) Judge Becker's decision should be binding on this Court, (2) state law applies because this was a joint investigation involving federal and state agencies and (3) Judge Becker's decision was correct and should be adopted. The Government responds that Judge Becker's decision is neither binding nor persuasive, that the investigation of illegal dumping was not a joint investigation, and even if the stop of the Defendant's truck were to be held unlawful, the interview of Ms. Ortega by federal agents was sufficiently attenuated from the tainted stop that the exclusionary rule should not apply.

### A. Effect of the County Court Decision

The Defendant concedes that Eleventh Circuit precedent clearly holds, based on the principle of dual sovereignty, that a federal court is not bound by a state court decision suppressing evidence. United States v. Ponce-Aldona, 579 F.3d 1218 (11th Cir. 2009); United States v. Perchitti, 955 F.2d 674, 676 (11th Cir. 1992). Therefore, the Defendant's first argument must fail. As to the Defendant's second argument, the evidence establishes that there was no federal involvement in the dumping case other than Agent Marin's translation services. The undersigned finds Agent Marin's actions did not transform this case into a joint investigation, in particular

7

because there is no federal interest in the dumping of yard waste, Agent Marin arrived at the scene well after the stop of the Defendant's truck, and questioned Ms. Ortega only about her name. The federal investigation began, months later, as the result of Sergeant Slough's conversation with the CBP officer regarding the stop of the Defendant's boat, not Agent Marin's brief conversation of Ms. Ortega.

### B. Legality of the Stop

The parties agree that a brief investigatory stop of a person or vehicle is permitted where a law enforcement officer has a reasonable suspicion that criminal activity "may be afoot." United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). The Supreme Court repeatedly has stated that in making reasonable-suspicion determinations, reviewing courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417-418 (1981)). Law enforcement officers may "draw on their own experience and specialized training to make inferences and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Id. (quoting Cortez at 418). Thus, "[a]lthough an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Id. at 274 (citations omitted).

A series of actions which are innocent by themselves, may, when taken together, warrant further investigation. Id. Moreover, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." Id. at 277 (citing Illinois v. Wardlow, 528 U.S. 119, 125 (2000)). In considering the factors on which an officer bases his decision to stop a vehicle, a court should not review each factor in isolation and reject those factors susceptible of innocent explanation. United States v. Bautista-Silva, 567 F.3d 1266, 1272 (11th Cir. 2009).

In the instant case, Sergeant Slough relied on several factors in making his decision to stop the Defendant's truck: (1) there had been a report of illegal dumping in the neighborhood which included Coco Plum Drive and Pescayo Avenue; (2) the Defendant's truck was stationary, and was backed into the dead end of Pescayo ( a street on which there generally was minimal traffic), and was in a location distant from the driveways of rental homes, where vehicles usually are parked; (3) as soon as Sergeant Slough turned his police car around to investigate, the Defendant drove away from the area, waving at the Sergeant as he passed; (4) there was a pile of green vegetation where the Defendant's truck had been parked, next to vegetation that clearly was older and dehydrated, and (5) the Defendant drove quickly to the intersection of Coco Plum Drive and US 1, where he changed from the right turn lane to the left turn lane. Also, although the dumping site was privately owned, the vegetation had not been properly packaged for pickup by the County, and Sergeant Slough knew that debris had been illegally dumped in the same location on prior occasions.

Although Sergeant Slough did not observe any action by the Defendant that was illegal in itself, the undersigned finds that, considering the totality of the circumstances, the Sergeant had a reasonable suspicion that the Defendant was engaging in illegal activity. In reaching the contrary result, Judge Becker relied on the case of Brown v. State, 687 So. 2d 13 (Fla. 5th DCA 1996). Although Brown has no precedential value in this Court, the undersigned also finds its facts to be distinguishable from those in the instant case.

In Brown, the defendant was detained and his vehicle searched when an officer observed him sitting in a parked truck in a wooded area known for illegal dumping, and making a furtive movement as the officer approached. Id. at 16. In the instant case, Sergeant Slough had several additional facts which gave rise to a reasonable suspicion of unlawful activity: a recent complaint of illegal dumping in the area where the Defendant's truck was parked; the Defendant's immediate departure from the location when the Sergeant stopped and turned around; the Defendant's waving at the Sergeant as he passed; the Sergeant's observation of a pile of green

vegetation next to brown, dehydrated vegetation in the spot where the Defendant's truck had been parked, and the Defendant's lane change as the Sergeant approached the intersection of Coco Plum and US 1.  Based on these facts, the undersigned finds that the stop of the Defendant's truck was lawful, and evidence obtained as a result of that stop need not be suppressed.

### C. Attenuation

The Government also argues that regardless of the legality of the stop, "the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.'"  Wong Sun v. United States, 371 U.S. 471, 487, 491 (1963).  In United States v. Ceccolini, 435 U.S. 268 (1978), the Supreme Court considered whether the exclusionary rule should apply where the alleged "fruit of the poisonous tree" was a live witness.  In that case, a police officer found an envelope containing betting slips under a cash register in a flower shop where the witness was employed.  The officer reported the discovery to local detectives, who in turn relayed the information to the FBI.  Four months later, an FBI agent interviewed the witness, and her information later was used in a federal prosecution of Ceccolini for perjury.

In deciding whether the witness' testimony could be used despite the fact that the betting slips had been unlawfully viewed by the police officer, the Court first noted that a living witness cannot be mechanically equated with inanimate objects that are illegally seized.  Thus, the "'fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence.'"  Id. at 277 (quoting Smith v. United States, 324 F.2d 879, 882 (D.C. Cir. 1963)).  The Court pointed out that excluding the testimony of a witness who surfaced as the result of an illegal search "would perpetually disable [the] witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby."  Id.  For these reasons, the Court

determined that "closer, more direct link between the illegality and that kind of testimony is required." Id. at 278.

The Court held that the witness' testimony should not be suppressed, based on several factors: (1) the witness testified of her own free will and was in no way coerced or even induced by official authority as a result of the officer's discovery of the betting slips; (2) the betting slips were not used in questioning the witness; (3) substantial time had elapsed between the illegal search and initial contact with the witness and the witness' testimony at trial; (4) there was nothing to suggest that the officer entered the shop or picked up the envelope with the intent of finding tangible evidence of an illicit gambling operation, much less to find a witness to testify against Ceccolini, and application of the exclusionary rule would have no deterrent effect on the officer. Id. at 279-280.

The Eleventh Circuit has construed Ceccolini as requiring a district court to consider the degree of free will exercised by the witness and to "balance 'the social cost of exclusion that would perpetually disable a witness from testifying about relevant and material facts against the efficacy of exclusion in furthering the deterrent purpose of the exclusionary rule.'" United States v. Bergin, 455 Fed.Appx. 908, 910 (11th Cir. 2012) (quoting United States v. Brookins, 614 F.2d 1037, 1042 (5th Cir. 1980)). Applying these principles, the Bergin Court held that the testimony of a witness who was identified during the course of an illegal search need not be suppressed because (1) the witnesses acted of their own free will, despite the fact that their statements were made after they were arrested and had an incentive to cooperate; (2) the statements were made two months after the illegal search, and (3) there was no indication that the exclusion of the witness' testimony would have a deterrent effect on the actions of law enforcement. Id. at 911.

In the instant case, Ms. Ortega was interviewed by Agent Blyth six months after the search of the Defendant's truck. Although she might have decided to cooperate in order to avoid prosecution or deportation, this does not render her statement involuntary, and there is no evidence that she was improperly coerced. Finally, as the Court stated in Bergin, given the length of time

between the stop and the opening of a federal investigation of the Defendant, "the social cost of excluding such evidence outweighs the deterrent effect because there is nothing in the record to suggest that the exclusion of such evidence would have a deterrent effect on law enforcement misconduct." Id.  Therefore, even if this Court were to find that the stop of the Defendant's truck was unlawful, the testimony of Ms. Ortega and its fruits should not be suppressed.

### III. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the Defendant, Lawrence W. Blessinger's Motion to Suppress Evidence (ECF No. 75) be DENIED.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Jose E. Martinez, United States District Judge.  Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report, except upon grounds of plain error if necessary in the interest of justice.  See 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 14th day of December, 2016.

/s/ Lurana S. Snow
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

AUSA Matt Langley (MIA)
AUSA Brooke Watson (MIA)
Howard Srebnick, Esq. (D-Lawrence Blessinger)
Jacqueline Perczek, Esq. (D- Lawrence Blessinger)
Phillip Hororwitz, Esq. (D- Janet Meadows)